UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BRUCE CHAPMAN; and HANDLE WITH CARE
BEHAVIOR MANAGEMENT SYSTEM, INC.,

                                Plaintiffs,

vs                                 1:04-CV-867

NEW YORK STATE DIVISION FOR YOUTH;
NEW YORK STATE DEPARTMENT OF SOCIAL
SERVICES; NEW YORK STATE OFFICE OF
CHILDREN & FAMILY SERVICES; JOHN JOHNSON,
Commissioner of New York State Office of Children
and Family Services and former Commissioner of the
New York State Division for Youth, in his Official and
Individual Capacity; MARGARET DAVIS, Former
Director of Training for the New York State Division
for Youth, and former Director of Training for New
York State Office of Children and Family Services,
in her Official and Individual Capacity; PATSY MURRAY,
Former Associate Training Technician for the New York
State Division for Youth, and Current Position as Trainer
for New York State Office of Children and Family Services,
in her Official and Individual Capacity; CORNELL
UNIVERSITY; JEFFREY LEHMAN, President of Cornell
University, in his Official and Individual Capacity; DOCTOR
HUNTER RAWLINGS, III, Former President of Cornell
University, in his Official and Individual Capacity; NEW
YORK STATE COLLEGE OF HUMAN ECOLOGY;
FAMILY LIFE DEVELOPMENT CENTER; RESIDENTIAL
CHILD CARE PROJECT; THERAPEUTIC CRISIS
INTERVENTION; MARTHA HOLDEN, Project Director
of the Residential Child Care Project and Therapeutic
Crisis Intervention Trainer and Coordinator, in her Official
and Individual Capacity; MICHAEL NUNNO, Project Director
of the Residential Child Care Project and Therapeutic Crisis
Intervention Trainer, and Coordinator, in his Official and
Individual Capacity; HILLSIDE CHILDREN'S CENTER;
DENNIS RICHARDSON, President, and CEO of Hillside
Children's Center, in his Official and Individual Capacity;
DOUGLAS BIDLEMAN, Employee of Hillside Children's
Center, and Therapeutic Crisis Intervention Trainer, in
his Official and Individual Capacity; and JOHN DOE,
1 through 99,

                                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

U. S. DISTRICT COURT
N. D. OF N. Y.
FILED

SEP 2 9 2005

AT _____ O'CLOCK ____ M
LAWRENCE K. BAERMAN, Clerk
UTICA

| | |
|---|---|
| APPEARANCES: | OF COUNSEL: |

BRENDAN KENNEDY, ESQ.
Attorney for Plaintiffs
184 McKinstry Road
Gardiner, NY 12525

HILARY ADLER, ESQ.
Attorney for Plaintiffs
184 McKinstry Road
Gardiner, NY 12525

HON. ELIOT SPITZER                                                            DOUGLAS J. GOGLIA, ESQ.
Attorney General of the                                                       Asst. Attorney General
  State of New York
Attorney for Defendants, NYS Division for Youth;
    NYS Department of Social Services; NYS
    Office of Children & Family Services; John
    Johnson; Margaret Davis; and Patsy Murray;
Department of Law
The Capitol
Albany, New York 12224

OFFICE OF UNIVERSITY COUNSEL                                    NELSON E. ROTH, ESQ.
Attorneys for Cornell University; Jeffrey Lehman;               PATRICIA A. McCLARY, ESQ.
    Doctor Hunter Rawlings, III, NYS College of                VALERIE L. CROSS, ESQ.
    Human Ecology; Family Life Development
    Center; Residential Child Care Project;
    Therapeutic Crisis Intervention; Martha Holden;
    and Michael Nunno
300 CCC Building
Garden Avenue
Ithaca, NY 14853

KERNAN PROFESSIONAL GROUP, LLP                                  DAVID A. BAGLEY, ESQ.
Attorneys for Hillside Children's Center;
    Dennis Richardson; and Douglas Bidleman
1310 Utica Street
P.O. Box 750
Oriskany, NY 13424

DAVID N. HURD
United States District Judge

**MEMORANDUM-DECISION and ORDER**

**I. INTRODUCTION**

Plaintiffs, Handle With Care Behavior Management System, Inc. ("HWC") and its president, Bruce Chapman ("Chapman", collectively "plaintiffs"), market a behavior management program which is used by persons who must physically restrain others. The allegations involve the misuse of plaintiffs' program and related conduct which plaintiffs allege affects the market for such services. The action is brought against three sets of defendants who have filed their motions accordingly.

The "state defendants" include New York State Office of Children and Family Services ("OCFS"), which assumed the functions of two other defendants in 1998 - New York State Division of Youth and Family Services ("DFY"); and New York State Department of Social Services ("DSS").[1] Defendant John Johnson was the former Commissioner of DFY, and now serves as the Commissioner of OCFS. Defendant Margaret Davis was the Director of Training for DFY, and now serves as the Director of Training for OCFS. Defendant Patsy Murray was an Associate Training Technician for DFY, and now serves as a Trainer for OCFS.

There are nine "Cornell defendants." Plaintiffs bring suit against Cornell University itself and two of its presidents: Jeffrey Lehman, a former president; and Hunter Rawlings III, its current president. Defendant New York State College of Human Ecology is a statutory college of State University of New York (the "College"). Three defendants are alleged subsidiaries of the College: The Family Life Development Center; The Residential Child

---

[1] DFY operated juvenile facilities. DSS supervised child care providers.

Care Project; and Therapeutic Crisis Intervention ("TCI"). Finally, Martha Holden and Michael Nunno are Project Directors of The Residential Child Care Project and TCI Trainers and Coordinators.

The third set of defendants are referred to as the "Hillside defendants." Hillside Children's Center ("HCC") is a private childcare provider and residential treatment center. Plaintiff asserts claims against HCC, its president, Dennis Richardson, and its Coordinator for Sociotherapy Training, Douglas Bidleman.

Plaintiffs brings ten causes of action. The <u>First</u> through <u>Fifth</u> causes of action are brought against the state defendants: <u>First</u> cause of action, Copyright Infringement, 17 U.S.C §§ 101 et. seq.; <u>Second</u> cause of action, Breach of Contract; <u>Third</u> cause of action, Fraud; <u>Fourth</u> cause of action, Conversion; and, <u>Fifth</u> cause of action, Tortuous Interference with a Business Relationship. The <u>Sixth</u> cause of action is brought only against the Hillside defendants for breach of contract.

The <u>Seventh</u> through <u>Tenth</u> causes of action are brought against all the defendants: <u>Seventh</u> cause of action, Monopolies, Restraint of Trade and Unfair Competition; <u>Eighth</u> cause of action, Conspiracy to Monopolize and Restrict Trade; <u>Ninth</u> cause of action, Misappropriation Tort for Business Scheme, Tort of Trade Secret Service Mark Dilution, Unfair Competition at Common Law; and <u>Tenth</u> cause of action, Unjust Enrichment.

The <u>First</u>, <u>Seventh</u> and <u>Eighth</u> causes of action are federal claims. The remaining causes of action are state law claims under supplemental jurisdiction.

The state and Cornell defendants move pursuant to Fed. R. Civ. P. 12 (b) to dismiss the complaint as it pertains to them. The Hillside defendants move to dismiss the complaint pursuant Fed. R. Civ. P. 12 (c) and, in the alternative, for summary judgment pursuant to

Fed. R. Civ. P. 56.  Plaintiffs oppose.  Oral argument was heard on February 28, 2005, in Albany, New York.  Decision was reserved.

## II. FACTS

New York State, through OCFS, formerly DFY and DSS, operates juvenile facilities and supervises child care providers within the state.  It is sometimes necessary to "physically restrain juveniles in certain circumstances; for example when a juvenile threaten[s] an immediate injury to themselves, a DFY staff member, or other juveniles." (Docket No. 1, Complaint, ¶ 24.) ("Complaint at __".)  To ensure the safety of the juveniles, child care providers must use state approved techniques.

> Pursuant to 18 N.Y.C.R.R. § 441.17  Restraint of children in care:
>
> (c) An authorized agency shall not use any method of restraint unless it has submitted its restraint policy to the department and such policy has been approved in writing by the department in accordance with subdivision (d) of this section.
> . . .
> (3) The duration of department approval will be for a period of two years.

OCSF is charged with approving and regulating the training of such techniques pursuant to N.Y. Exec. Law § 501, which lists the functions, powers and duties of OCFS.  Listed among those duties, the statue explicitly requires the agency :

> 12. To promulgate regulations concerning standards for the protection of children in residential facilities and programs operated or certified by the division, from abuse and maltreatment.  Such standards shall include the prevention and remediation of abuse and maltreatment of children in such residential facilities or programs, including procedures for:
> . . .
> . . . the characteristics of children in care and techniques of group and child management including crisis intervention. . .
> . . .
> The division . . . shall monitor and supervise the provision of training to such administrators, employees, volunteers, children and consultants.

Chapman, now president of HWC, has been involved in training others to use restraint techniques since the 1980s. The HWC program consists of a series of manuals, a performance based training program, and audio visual productions. (Complaint at ¶ 44.) Chapman obtained a copyright for HWC trainer's manual entitled "Handle with Care - A Revolutionary Approach to Behavior Management" and all written HWC materials were marked with a copyright notification. Id. at ¶ 45. "Child care providers and residential treatment centers frequently employ vendors like HWC to provide a use of force program and train staff." Id. at ¶ 33. In fact, DFY contracted with Chapman for training services in 1987. (Docket No. 60, Goglia Dec. Ex. A.)

Prior to 1998, DFY was the agency responsible for the care and welfare of all juveniles in New York State's custody; and one of its responsibilities involved creating procedures and training staff in restraint techniques. Id. at 24. Between 1994 and 1996, while employing restraint techniques, DFY staff inflicted injuries on one juvenile and killed another. Id. at ¶¶ 26, 58. Thereafter, "DFY retained HWC to proved a safe use of force program and to train DFY staff in that program which included restraint techniques." Id. at ¶ 27. Defendant Director of Training Margaret Davis worked on the terms of the agreement. Id. at ¶ 60. "On or about April 23, 1997 a contract was entered into between [p]laintiff and DFY, whereby [p]laintiff agreed to deliver 12 days of training, certify staff as instructors and provide written and audio visual training materials." Id. at ¶ 50. According to plaintiff, each staff person signed contracts acknowledging that their ability to train [p]laintiff's program terminated one year post training. Id. at ¶ 62. Plaintiff asserts that the contract also limits the use of training materials to one year. Id. at ¶ 51.

After DFY merged into OCFS in 1998, OCFS continued to use HWC's program and techniques, allegedly, without license or permission and has been reproducing without license, authorization, permission or compensation to plaintiff. Id. at ¶¶ 30, 46. Plaintiffs' requests for the return of the materials have been ignored. Id. at ¶ 68.

In October of 2001, plaintiffs entered into a training contract with HCC. Id. at ¶ 76. The contract provided that "the Agency and/or employee of the Agency receiving Handle With Care's program and training acknowledges that the Program and Training contain confidential information and trade secrets developed and owned by Handle with Care and agrees to treat such information as confidential." Id. at ¶ 77 (quoting the contract.) On or about August 2002, plaintiffs discovered that HCC and Douglas Bidleman, a HCC training coordinator, "appeared in TCI's training manual and video illustrating proprietary HWC information covered under the confidentiality clause of the contract." Id. at ¶ 79.

"New York State owns its own use of force program in conjunction with Cornell University and the State of New York College of Human Ecology. . . . This program is called TCI and is administered and controlled by Cornell University." (Complaint at ¶ 35, 87.)[2] Plaintiff alleges that TCI illegally incorporates "techniques, methods, materials, and information unique to and identified with HWC's program and training." Id. at ¶ 37. Plaintiff further complains that TCI and HWC are competitors and TCI's possession of HWC property is giving TCI an unfair advantage.

This action was prompted in part by an apparent policy change at OCFS wherein OCFS now refuses to allow agencies to submit use of force policies other than the policy

---

[2] According to the Cornell defendants, Cornell owns the program but New York State has unlimited use of the materials. (Docket No. 51, Cornell's Mot. to Dismiss, 11.)

promulgated by TCI. Id. at ¶¶ 34,36. This policy change, allegedly attributable to OCFS, Cornell, the College and TCI, "insure[s] that the State's program has exclusive access to the market." Id. at ¶ 73. "OCFS has created an environment whereby private child care providers can only use TCI as their use of force training provider or risk their license and ability to do business within the State of New York." Id. at ¶ 88. This precludes plaintiffs and other vendors from the marketplace and creates a TCI monopoly in providing child restraint training services. Id. at ¶ 90.

## III. DISCUSSION

### A. Motion to Dismiss

In deciding a Rule 12(b)(6) motion, a court "must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994); see also Kaluczky v. City of White Plains, 57 F.3d 202, 206 (2d Cir. 1995). However, conclusory allegations that merely state the general legal conclusions necessary to prevail on the merits and are unsupported by factual averments will not be accepted as true. See, e.g., Clapp v. Greene, 743 F. Supp. 273, 276 (S.D.N.Y. 1990); Albert v. Carovano, 851 F.2d 561, 572 (2d Cir. 1988). The court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). Therefore, the defendants' present motions will only be granted if it appears that the plaintiffs can prove no set of facts in support of their claims that would entitle it to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Goldman, 754 F.2d at 1065.

### B. Copyright Claims

The First cause of action against the state defendants alleges that "OCFS (formally DFY), without license, assignment or permission, took [p]laintiff's copyrighted materials, and has been reproducing such protected materials without license, authorization, permission or compensation to [p]laintiff." (Complaint at ¶ 46.) It is not disputed that the state defendants copied the materials. At issue is whether or not they were licensed to do so. This determination turns on the non-exclusive license to use the materials granted in the parties' contract. The state defendants assert that they were expressly authorized to copy HWC materials and "[a] copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement." Graham v. James, 144 F.3d 229, 236 (2d Cir. 1998). Plaintiffs assert that the contract contains a one-year limitation on defendants' license to reproduce the materials.

"In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991). The complaint repeatedly refers to the contract, but plaintiffs declined to attach a copy to the complaint. Defendants included a copy as an exhibit and plaintiffs note that the exhibit "appears to be a copy" of the contract at issue. The contract is properly considered on this motion.[3]   I. Meyer Pincus & Assoc., P.C.

---

[3] As federal jurisdiction is lacking, the state law breach of contract claims will be dismissed without prejudice and no comment is required as to those claims. However, it is noted that plaintiff also declined to attach the contract relevant to the Sixth cause of action alleging breach a contract against the Hillside defendants. The Hillside defendants claim to have no knowledge of that contract. In response to defendants' statement, plaintiff notes only that defendants have not cited a case or rule for the proposition that the contract must be attached to the complaint. This response sullies the spirit of liberal pleading requirements of Fed. R. Civ. P. 8 and taps the resources and patience of all involved in the
(continued...)

v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991) (plaintiff not permitted to evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach a document); Yak v. Bank Brussels Lambert, 252 F.3d 127, 131 (2d Cir. 2001).

In 1997, Chapman entered into the contract at issue with DFY. He agreed to "update and recertify existing Crisis Management/Physical Restraint trainers in the techniques encompassed in the Handle with Care Program." (Docket No. 60, Goglia Dec. Ex. B, 1.) The contract called for Chapman to deliver 12 days of training over a three-month period to approximately 120 state employees. Id. at 1-2. The contract also provides: "The Contractor acknowledges and agrees that the Division has the right to reproduce all training materials." Id. at 2. This is a logical inclusion because Chapman was training trainers who would require the materials.

Despite plaintiffs' repeated assertions, the contract simply does not contain a provision limiting this license to use the materials to one-year or any other duration of time. The contract, drafted by Chapman, is clear and unambiguous. Plaintiffs do not argue that it suffers any legal defect or otherwise attack the validity of the agreement. Plaintiffs never assert that any other representations were made or agreed upon extraneous to the contract.

Dismissal is proper where the documents upon which a claim is based show on their face an absence of any grounds for relief. Feick v. Fleener, 653 F.2d 69, 75 (2d Cir. 1981). Plaintiffs' allegations are contradicted by the contract itself and are therefore insufficient to defeat a motion to dismiss. Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) (citing Broadway LLC v. Credit Suisse First Boston, No. 00 Civ. 5773 2001 U.S. Dist.

---

[3](...continued)
litigation.

LEXIS 4875, *27 (S.D.N.Y. Apr. 20, 2001)). The copyright claim will be dismissed as plaintiffs have not demonstrated a limitation on defendants non-exclusive license to reproduce materials and therefore failed to state a claim upon which relief may be granted.[4]

### C. Antitrust claims

In the <u>Seventh</u> and <u>Eighth</u> cause of action the plaintiffs bring antitrust claims against all of the defendants.[5] In short, plaintiffs allege that the Cornell defendants developed the TCI program which the state defendants require child care providers to purchase. Thus, these defendants have participated or acquiesced in a plan whereby TCI obtained a monopoly over the right to train private child care providers in New York State. (Complaint at ¶ 95.) Plaintiffs characterize this conduct under the <u>Seventh</u> cause of action as a monopoly, restraint of trade and unfair competition. Plaintiffs allege that essentially the same conduct constitutes a conspiracy to monopolize and restrain trade in the <u>Eighth</u> cause of action. <u>Id</u>. at ¶ 95.

---

[4] As noted above, jurisdiction will be declined over the state law claims and thus plaintiffs' <u>Second</u> cause of action for breach of contract will be dismissed. It is noted however that it suffers from the same deficiency as the copyright claim because it is based on allegations that state defendants acted beyond a durational limitation: (1) "The contract provided that DFY to reproduce (sic) such written and audio visual materials for the benefit of its trainers and staff for a period of one year commencing on the date of training and ending on the training's one year anniversary." (Complaint at ¶ 51.); (2) "The contract also provided that DFY trainers could train DFY staff in Plaintiff's program for a period of one year commencing on the date of training and ending on the training's one year anniversary." (Complaint at ¶ 52.); and, (3) defendant has continued to reproduce the materials and continued to train staff beyond the one-year limitation (Complaint at ¶¶ 52, 53.)

[5] The <u>Seventh</u> cause of action never mentions the Hillside defendants. The <u>Eighth</u> cause of action simply lists them as conspirators. There are simply no allegations to support plaintiff's claims that the Hillside defendants participated in monopolization or conspiracy to monopolize the relevant market. Those claims are therefore subject to dismissal regardless of plaintiff's other pleading deficiencies. <u>Heart Disease Research Foundation v. General Motors Corp.</u>, 463 F.2d 98, 100 (2d Cir. 1972).

These claims are brought pursuant to the Sherman Act §§ 1 and 2, 15 U.S.C. §§ 1 and 2.[6] Section 1 of the Sherman Act, makes unlawful "every contract, combination or conspiracy, in restraint of trade or commerce among the several States." Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." The defendants, in chorus, present two grounds for dismissing the claims: state action immunity and failure to define a market that supports an antitrust claim.

1. **Immunity**

"The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state." Parker v. Brown, 317 U.S. 341, 351 (1943). Therefore, "[a]bsent a clear indication from Congress, the States are entitled to immunity as an aspect of the federal system." Hybud Equipment Corp. v. City of Akron, Ohio, 742 F.2d 949, 954 (6th Cir. 1984). Immunity may be extended to private parties who act in concert with the state in affecting its policies. Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc., 790 F.2d 1032, 1048 (2d Cir. 1986). Here the state defendants argue that they are entitled to Eleventh Amendment immunity, and the Cornell defendants argue that an extension of that immunity applies to their activities. As such, OCFS must be granted immunity in order for the private defendants to share in the benefit.

A state agency is entitled to immunity in one of two ways. First, the agency may be deemed an arm of the state in which the conduct of the agency is deemed the conduct of the

---

[6] Plaintiffs clarified this portion of the pleading in opposition memorandum. (Docket No. 67, Pl.'s Opp'n Mem., at 10)

state itself and is thus entitled to immunity. <u>Hess v. Port Auth. Trans-Hudson Corp.</u>, 513 U.S. 30, 61-62 (1994). Second, immunity may be conferred through what is known as "authorization." "Where the activity . . . 'is not directly that of the legislature or supreme court, but is carried out by others pursuant to state authorization,' the application of the exemption [is not as clear and] requires a more searching analysis." <u>Id</u>. at 955. (quoting <u>Hoover v. Ronwin</u>, 466 U.S. 558 (1984)). "[T]he anticompetitive conduct of a nonsovereign state representative . . . require[s] a showing that the conduct is pursuant to a 'clearly articulated and affirmatively expressed state policy' to replace competition with regulation." <u>Hoover</u>, 466 U.S. at 569 (citation omitted).[7]

"[T]he 'clear articulation' label is not quite the hurdle that its language suggests because it has always been construed as synonymous with the foreseeability test." <u>Automated Salvage Transp. v. Wheelabrator Envtl. Sys.</u>, 155 F.3d 59, 69 (2d Cir. 1998). "So long as the resulting anticompetitive activities are a foreseeable consequence of the state delegation, the 'clear articulation' standard has been met. To meet this requirement the party claiming the state action defense must show that the 'legislature contemplated the action complained of.'" <u>Cine 42nd Street Theater Corp.</u>, 790 F.2d at 1043 (citations omitted).

> [T]he enabling legislation need not explicitly authorize the exact actions undertaken. It is only necessary that the permitted actions produce anticompetitive consequences that foreseeably flow from the grant of state authority. That is, the enabling statute must affirmatively designate a particular area to be regulated, provide the methods of regulation, and create grounds for a reasoned belief that some anticompetitive activity could be envisioned.

---

[7] "[T]he challenged restraint must be '[f]irst, one clearly articulated and affirmatively expressed as state policy'; [and] second, the policy must be 'actively supervised' by the State itself." <u>California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.</u>, 445 U.S. 97, 105 (1980) (quoting <u>Lafayette v. Louisiana Power & Light Co.</u>, 435 U.S. 389, 410 (1978) (opinion of Brennan, J.)). Active state supervision is not required where the actor is a state agency. <u>Hallie v. Eau Claire</u>, 471 U.S. 34, 46 n.10 (1985).

Id. at 1043 -1044.

Defendants assert that OCFS is entitled to immunity on both grounds. In the instant case, it is not necessary to delve into the complex and murky analysis of whether or not the state exercises sufficient control over the agency for it to be deemed an arm of the state[8] or the intended scope of the legislative regulatory authority conferred on agency.[9] Even if

---

[8] While it is clear that the state legislature and courts are arms of the state, classifying inferior subdivisions or agents can be exceedingly difficult. See Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law An Analysis of Principles and Their Application, ¶ 224 (b) (2002). Despite the intuitive sense that OCFS acts as the state itself, it is not ipso facto entitled to state immunity. "[T]he issue must ultimately depend on whether the sovereign power of the state is so involved in the organization and operation of the entity as to directly implicate the fundamental policy of federalism secured by the Eleventh Amendment." Daniel v. Am. Bd. of Emergency Med., 988 F. Supp. 127, 153 (W.D.N.Y. 1997) (citations omitted.)
> [T]he court [must] assess whether the entity constitutes an arm of a state by evaluating the degree of control and supervision over the entity, including the state's power of appointment and removal of officers or directors, any authority to approve or disapprove the actions of the entity, including its capacity to raise revenue for its own purposes, whether the entity is financially independent from the state, whether the state is responsible for the entity's obligations and liabilities, and the character of its functions, i.e., state-wide or local, are performed or served by the entity.

Id. at 151-152.

The state defendants point to legislation granting OCFS extensive regulatory power, the fact that the Governor appoints the commissioners of OCFS and DSS, and cite Automated Salvage Transport, Inc. v. Wheelabrator Env'tl Sys., 155 F.3d 59, 70 (2d Cir. 1998) and Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 61(1994), in arguing for immunity.

A broad legislative grant of extensive regulatory power is not an obviously controlling factor. OCFS's powers do not seem more extensive than the home rule powers of municipalities, and those entities are not immune on that ground. Neither Hess or Wheelabrator offer much guidance. OCFS is clearly different from the bi-state agency operating a commuter railroad between states and the solid waste authority that maintains a vast system of solid waste management projects that were at issue in Hess and Wheelabrator. The nature of the activity is different, as is the extent of both government control and agency accountability to the public.

[9] "When a state agency, municipality, or other state subdivision claims state immunity from federal law, it must first identify a 'clearly expressed state policy' that authorizes its actions." Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc., 790 F.2d 1032, 1043 (2d Cir. 1986) (quoting Hallie, 105 S.Ct. at 1717). "The clarity of such policy is often a function of how broadly the legislation is drawn, with the existence of such policy being more readily discernible in narrowly drawn legislation. The legislation must contain an affirmative showing of intent, though it need do no more than authorize the challenged conduct." Id. (quoting Southern Motor Carriers Rate Conference v. United States, 105 S.Ct. 1721, 1729 (1985)).

As related above, OCFS is charged with broad powers of operation and regulation which have allegedly had anticompetive effects. An "adequate state mandate for anticompetitive activities . . . exists when it is found 'from the authority given a governmental entity to operate in a particular area, that the [state] legislature contemplated the kind of action complained of.'" Wheelabrator, 155 F.3d at 69. (citations omitted).

In areas of zoning, economic development or regulation of commercial entities in regional areas to solve environmental problems, it is easy to infer that exercise of the agency's mandate will result in

(continued...)

OCFS was not immune under the Eleventh Amendment, plaintiffs have failed to state an antitrust claim under Fed. R. Civ. P. 12(b)(6).  See Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law An Analysis of Principles and Their Application, ¶ 224 (2002) (noting that many antitrust allegations, like exclusive contracting, against state sub-divisions will not violate anti-trust law, and where the substantive antitrust issue is clear, the logic of courts bypassing the state action question altogether).

### 2. Market Definition

"The essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint on a defendant's 12(b)(6) motion." Found. for Interior Design Educ. Research v. Savannah College of Art & Design, 244 F.3d 521, 530 (6th Cir. 2001).  "While the pleading standard under the federal rules is very liberal . . . the price of entry, even to discovery, is for the plaintiff to allege a factual predicate concrete enough to warrant further proceedings, which may be costly and burdensome." Id. (citation omitted.)  "It is well-settled that an antitrust complaint must allege a relevant market in which the anti-competitive effects of the challenged activity can be assessed." Evac, LLC v. Pataki, 89 F.Supp.2d 250, 260-61 (N.D.N.Y. 2000) (citing Jefferson Parish Hospital. Dist. No. 2 v. Hyde, 466 U.S. 2 (1984)).

"In order to survive a motion to dismiss, a claim under the Sherman Act §§ 1 and 2, 15 U.S.C.S. §§ 1 and 2, must allege a relevant geographic and product market in which trade

---

[9](...continued)
displacement of competitors.  Here, under a plain reading, the legislation reveals the state's concern, and subsequent policy, that child care providers receive sufficient training in restraint techniques.  While it may easily be inferred that the state is neutral or indifferent to the means by which this is accomplished, it is not the sort of mandate which leads to an inference that the state intends to trump federal antitrust policy.

was unreasonably restrained or monopolized." Global Discount Travel Servs., LLC v. TWA, 960 F. Supp. 701 (S.D.N.Y. 1997); Jefferson Parish, 466 U.S. at 29; In re NASDAQ Market-Makers Antitrust Litig., 894 F. Supp. 703, 710-711 (S.D.N.Y. 1995). Otherwise, "it is impossible for a court to assess the anticompetitive effect of challenged practices." Re-Alco Industries, Inc. v. National Center for Health Educ., Inc., 812 F. Supp. 387, 392 (S.D.N.Y. 1993). Accordingly, failure to define the relevant market constitutes grounds for dismissal. Discon Inc. v. Nynex Corp., 86 F. Supp. 2d 154, 161 (W.D.N.Y. 2000).

Plaintiffs argue that they have properly defined a relevant market, but first, that they are free from the burden of engaging in market analysis to demonstrate the effect of defendant conduct on the market because they have asserted per se claims. A per se claim is alleged when the alleged conduct falls within a "narrow range of behavior that is considered so plainly anti-competitive and so lacking in redeeming pro-competitive value that it is 'presumed illegal without further examination,' that is, it is illegal per se." Geneva Pharms. Tech. Corp. v. Barr Labs., Inc., 386 F.3d 485, 506 (2d Cir. 2004) (quoting Broad. Music, Inc. v. Columbia Broadcast System, Inc., 441 U.S. 1, 8 (1979)). It is true that claims of per se violations of the Sherman Act relieve plaintiffs of demonstrating anticompetitive effects under the burdensome multi-part rule of reason analysis applied to most claims. Id. at 507. However, plaintiffs cannot avoid the burden of meeting the standing requirement of alleging injury to competition, not simply injury to HWC, which, here, requires a properly defined market. See Discon, 86 F. Supp. 2d at 159 (citing Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 341-44 (1990)); Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977)).

Moreover, plaintiffs have not alleged a per se violation of the Sherman Act. That characterization is applied to a short list of violations which generally includes naked horizontal price fixing, market allocation and output restrictions. See Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 62 (1st Cir. 2004). As will be explained below, plaintiffs' allegations amount to a claim of illegal exclusive contracting, which is not a per se violation because such arrangements are frequently found to benefit competition. Id. at 62; Geneva Pharms. Tech. Corp. v. Barr Labs., Inc., 386 F.3d 485, 508 (2d Cir. 2004).

Turning to plaintiffs' definition of the relevant market. The complaint does not specifically purport to define the relevant market, but repeatedly refers to "training services to New York State child care providers." (Complaint at ¶¶ 90, 91, 95.) Plaintiffs' construction of the market is based on child care providers' need for state certification which involves OCFS's approval of a particular service provider.

On a motion to dismiss, the allegations complaint are taken as true and it is therefore presumed that OCFS refuses to grant approval of physical restraint programs other than TCI. OCFS therefore effectively exercises the child care providers' market choice in service providers. But then, it was OCFS that created the need for certification. At oral argument, plaintiff referred to the relevant market as the "OCFS market." This is not a proper antitrust market as it is defined in terms of the purchase(s) of a single -buyer, OCFS. See International Logistics Group, Ltd. v. Chrysler Corp., 884 F.2d 904, 909 (6th Cir. 1989); Discon, 86 F. Supp. 2d at 160. "[T]o define the relevant product market as that group of products over which defendants' anticompetitive conduct exercises control, . . . as an analytic matter, reads the market definition step out of the Sherman Act. " Discon, 86 F. Supp. 2d at

161 (citation omitted). Any anticompetitive effect resulting from allegedly biased purchasing decisions in the market must reflect the total demand for restraint services as a whole, not just OCFS's demand.

Plaintiffs have not alleged that there is anything particular in the provision of training to OCFS child care providers such that OCFS' training needs and/or materials should constitute a market in and of itself. It is not that Cornell defendants have monopolized the "OCFS certification required market", but rather that OCFS, as a participant or consumer in the restraint services market, has simply entered into an exclusive contract with Cornell defendants. Absent some compelling reason to adopt plaintiffs' market construction, the agreement must be evaluated in the terms of the restraint services market as a whole.

Plaintiffs have not properly defined a relevant product market but rather have defined the product to meet plaintiffs' definition of the OCFS market. The market for physical restraint programs includes social service agencies, law enforcement agencies, correctional facilities, educational institutions, and even airlines. Some portion of the program consists of behavior management techniques which may or may not be distinguishable from use of force techniques. It is also apparent that the restraint techniques are not strictly applicable to children.

Because the product market has been defined to include only the purchases of OCFS it is not possible to evaluate the effect of the OCFS and TCI arrangement on other service providers or consumers. "The relevant product market includes all products reasonably interchangeable, determination of which requires consideration of cross-elasticity of demand." Re-Alco, 812 F.Supp. at 391. "In the context of a Fed. R. Civ. P. 12(b)(6) motion to dismiss, an antitrust complaint must either allege facts regarding substitute

products, distinguish among comparable products, or allege facts relating to cross-elasticity of demand; otherwise, dismissal is appropriate." Intellective, Inc. v. Mass. Mut. Life Ins. Co., 190 F. Supp. 2d 600 (S.D.N.Y. 2002).

Plaintiffs have not offered any theoretically reasonable explanation for restricting the product market to child care providers that require OCFS approval, or provided a sufficient factual predicate to support an inference that OCFS enjoys any substantial market power in the broader market for restraint services. This failure is fatal to their antitrust claims. See Evac, LLC v. Pataki, 89 F.Supp.2d 250, 260-61 (N.D.N.Y. 2000).

Plaintiffs' pleading of a geographic market is also fatally insufficient. Here, plaintiffs have narrowed the geographic market to child care providers in New York State, yet even plaintiffs seem constrained by that definition. Plaintiffs state that their customer base, child care providers, are national consumers of training services. (Complaint at ¶ 93.) Plaintiffs also note that HWC competes for national and international training contracts. Id. at ¶¶ 93, 98. Yet, plaintiffs have not attempted to describe a market in which defendants are affecting training services in a national market, let alone international market. The actual economic reality of the relevant market is no doubt larger than New York State and smaller than the entire international market, but plaintiffs have not provided sufficient facts to support any particular inference as to what it might be. See Evac., 89 F.Supp.2d at 261.

The antitrust claims will be dismissed as plaintiffs have failed to define a proper product or geographic market.

### D. State Law Claims

"Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state law claims where 'the district court has dismissed all

claims over which it has original jurisdiction.'"  Manhattan Telecomms. Corp. v. DialAmerica Mktg., 156 F. Supp. 2d 376, 384 (S.D.N.Y. 2001).  Considering that the federal claims in this action are eliminated at the early pleading phase of the litigation, supplemental jurisdiction of the remaining state laws claims is declined, and those claims will be dismissed without prejudice.  See Valencia v. Sung M. Lee, 316 F.3d 299, 305 (2d Cir. 2003) (citing 28 U.S.C. § 1367(c)); Martinez v. Simonetti, 202 F.3d 625, 636 (2d Cir. 2000) (directing dismissal of supplemental state law claims where no federal claims remained).

## IV. CONCLUSION

Plaintiffs' copyright claim is not supported by sufficient facts alleging that the state defendants reproduced copyrighted materials without a license or authorization.  Plaintiffs failed to adequately define a market to support the antitrust claims.

Therefore, it is

ORDERED that

1. Defendants' motions to dismiss the complaint are GRANTED;

2. The complaint is DISMISSED in its entirety, the First, Seventh, and Eighth causes of action stating federal claims are dismissed with prejudice, and the remaining causes of action stating state law claims are dismissed without prejudice.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

United States District Court

Dated:  September 29, 2005
        Utica, New York.